13 Cal.3d 636 (1975)
532 P.2d 123
119 Cal. Rptr. 475
In re LISA R., a Person Coming Under the Juvenile Court Law.
SACRAMENTO COUNTY WELFARE DEPARTMENT, Petitioner and Respondent,
v.
VICTOR R., Objector and Appellant.
Docket No. S.F. 23204.
Supreme Court of California. In Bank.
March 3, 1975.
*639 COUNSEL
Roberta Ranstrom, Roger K. Warren and Loren Mitchell for Objector and Appellant.
Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Rick McClendon and Susan Cohn, Deputy Attorneys General, for Petitioner and Respondent.
Frank J. Kanne, Jr., Griffith & Thornburgh and John R. Rydell II as Amici Curiae.
OPINION
WRIGHT, C.J.
Victor R. appeals from a juvenile court order entered upon the fourth annual review of the status of Lisa R., a minor, dependent ward of the court. Appellant particularly complains of rulings that he had no standing to offer evidence that he is Lisa's natural father and that he be excluded from the hearing. He seeks to establish his paternity in these proceedings as a basis to afford him visitation rights and eventually to effect a termination of Lisa's dependency status which was grounded on a finding that she is without a parent or guardian exercising parental care and control.[1]
*640 We hold for reasons which follow that under the circumstances present in the instant case the juvenile court does have jurisdiction to determine parentage. We further hold that under the due process clause of the Fourteenth Amendment as enunciated by the United States Supreme Court in Stanley v. Illinois (1972) 405 U.S. 645 [31 L.Ed.2d 551, 92 S.Ct. 1208] (see also Cal. Const., art. I, § 13) appellant does have standing to offer evidence that he is the natural father of the minor child.
The initial petition seeking a dependency determination for Lisa was filed by a probation officer of the County of Sacramento when Lisa was two years old. The petition recites that Lisa's mother had been found in a drunken condition in her gas-filled home with Lisa and another minor child and that the mother had been in an intoxicated condition on numerous occasions in the presence of Lisa during a six-month period. The probation officer's report in support of the petition recites that the mother had previously pleaded guilty to a child-neglect charge and was then on probation, and that her husband had a record of narcotic violations and was then in custody. The report further recites that the mother had disclosed that Lisa was conceived during a casual relationship with appellant while she was separated from her husband. At the time of the initiation of the probation officer's investigations the mother resided in an alcoholic rehabilitation home. However, she was reported to be pregnant, was contemplating an abortion and had been asked to leave the home. At the time the report was filed she was incarcerated in the county jail for drunkenness.
The petition was sustained on July 3, 1969, and Lisa was adjudged to be a dependent child of the juvenile court under section 600, subdivision (a).[2]
The first annual hearing to consider Lisa's continued dependency status was held on June 30, 1970. A probation officer's report discloses that Lisa's mother had become addicted to heroin; that the whereabouts of Lisa's father, identified as appellant, remained unknown; and that Lisa had been in three different foster homes but was doing well in her current placement. The court, through a referee, ordered that Lisa be continued in the status of a dependent child. Although it made no direct *641 finding of parentage, the court twice identified appellant as Lisa's father in the statement of its findings.
A probation officer's report submitted at the second annual review on June 29, 1971, discloses that the husband of Lisa's mother, identified as the "legal father" of Lisa, had died of an overdose of narcotics. The report also states that Lisa's mother continued to have drug-and alcohol-related problems which were affecting her emotional stability. Lisa is reported to have made good progress with her foster parents who wished to adopt her. Lisa's mother, however, had not given her consent to the adoption. The report also identifies appellant as the "father" of Lisa and sets forth an address for him. The court ordered that Lisa be continued in the status of a dependent child. Appellant was again identified twice in the court's findings as Lisa's father.
A third annual review of Lisa's status was conducted at a hearing on June 27, 1972. A probation officer reported that Lisa's mother continued to have the same alcohol and drug problems; that Lisa continued to do well in her foster home; and that her foster parents' efforts to adopt Lisa were unavailing because Lisa's mother had not given her consent although the mother had not seen Lisa for a year and a half.[3] The court again ordered that Lisa be continued in the status of a dependent child.
The fourth annual review of Lisa's status was conducted at hearings held on June 26 and July 19, 1973. The probation officer's report on this occasion identifies appellant as "Lisa's Putative Father" who had employed counsel to commence proceedings to have Lisa placed in his custody although he had "only seen Lisa approximately five times in the last five years and had had no visits with her during the last two years." Apparently this was brought about because appellant was of the opinion that he was not allowed to visit with the minor. The report further recites that appellant is a janitor; that he did not then live in a separate residence but lived with a sister; that he has twice been confined for *642 emotional problems in a state hospital; that in 1970 in response to his application for aid to the totally disabled he was examined by a physician who concluded that appellant suffered from conditions from which cure was doubtful without "good intensive psychiatric care"; that in further response to the same application a case worker had reported that appellant's conduct had been deemed by appellant's common law wife to endanger the lives of appellant, his common law wife, and her four-year-old daughter whom appellant had physically abused. The probation officer also reported that Lisa's mother had died shortly before the hearing date for the fourth annual review.
At the hearing the court first entertained appellant's offer of proof that he is Lisa's natural father and, after the offer, ordered that he had no standing and that he be excluded from the courtroom (see fn. 1, supra). This is the order from which the instant appeal is taken.[4]

I
(1a) We consider first a threshold issue: is the juvenile court vested with jurisdiction to determine the paternity of a minor dependent?
*643 (2) A superior court convened as and exercising the special powers of a juvenile court is vested with jurisdiction to make only those limited determinations authorized by the legislative grant of those special powers. (See §§ 500-945; see also People v. Superior Court (1930) 104 Cal. App. 276, 280 [285 P. 871].) Not specifically included within the jurisdictional grant is a power to determine the parentage of a juvenile. Generally the determination of parentage is within the broad jurisdiction of the superior court and is provided for in Civil Code section 231.
Notwithstanding the absence of specific authorization to make particular determinations, a juvenile court is nevertheless vested with the authority to make such determinations which are incidentally necessary to the performance of those functions demanded of it by the Legislature pursuant to the Juvenile Court Law.[5] (1b) That law is replete with references to "parents." In some of such instances the court is merely required to respond to allegations of parentage without first having actually to find the existence of a parent-child relationship.[6] However, in other significant respects the law cannot be judically applied without a determination of parentage when such question is placed in issue. Thus wardship may initially depend, in the circumstances of a particular case, on a finding that a minor has no parent (§ 600, subd. (a))[7] or "persistently or habitually refuses to obey the reasonable and proper orders or directions of his parents." (§ 601.) It is manifest that a juvenile court cannot find that a minor has no parent or that he refuses to obey a parent without a contemporaneous determination of parentage. (See also, § 726 (ordering limited control by parent), § 778 (petition by parent to modify or terminate dependency status).)
The finding of facts which constitute parentage as surely lie within the jurisdiction of the juvenile court as does the finding of facts which are *644 necessary in order to hold that a minor has violated a law.[8] In neither instance is the court specifically or expressly authorized or required to make such findings. The resolution of the question whether a minor is within the jurisdiction of the juvenile court because he has violated a law is to be made by that court independently of proceedings, if any, which may be had within the superior court in the exercise of its general jurisdiction. (See In re Johnson (1964) 227 Cal. App.2d 37, 39 [38 Cal. Rptr. 405]; see also People v. Silverstein (1953) 121 Cal. App.2d 140 [262 P.2d 656].) If a juvenile court has jurisdiction to find the fact of a commission of an offense by a minor in order to make a determination whether to impose dependency status because a juvenile has violated any law, then it follows that it must have jurisdiction to find the fact of parentage in reaching its determination whether to impose dependency status because a juvenile who needs care has no parent.
We accordingly conclude that a juvenile court is vested with jurisdiction to determine parentage of a minor when that finding is necessary to any ultimate determination with which it is charged. The juvenile court, accordingly, erred when it concluded that it lacked jurisdiction to make that determination in the instant case.[9]

II
(3) Appellant next contends that Lisa and the county are estopped to deny his paternity (1) because of the many references to him as Lisa's father in pleadings, reports and other representations made to him and to the juvenile court by county agents, and (2) because the issue of *645 parentage was necessarily made in his favor in collateral proceedings under Civil Code section 232, subdivision (a), in which the parties were the identical parties now before the court.
Evidence Code section 623 provides that "Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it." The essence of an estoppel, if it is applicable at all in these circumstances, is that the party to be estopped has by false language or conduct led another to do that which he would not otherwise have done and as a result thereof that he has suffered injury. (El Rio Oils v. Pacific Coast Asphalt Co. (1949) 95 Cal. App.2d 186 [213 P.2d 1]; 4 Witkin, Summary of Cal. Law (7th ed. 1960) pp. 2870-2871.) It is manifest that neither the county nor Lisa by representing that appellant is her natural father or that the county recognized appellant as such has induced appellant to his detriment to act in any manner he would not otherwise have acted in these proceedings. Appellant's burden in establishing his paternity is not affected by representations thus made as he has suffered no injury or detriment thereby and neither the county nor Lisa is estopped to deny her parentage.
(4) Appellant's claim that Lisa and the county are collaterally estopped to deny her parentage by reason of the proceedings in the superior court pursuant to Civil Code section 232, subdivision (a), is equally without merit. Code of Civil Procedure section 1908 provides that the effect of a judgment is conclusive in respect to a determination of "the personal ... or legal condition or relation of a particular person." It is claimed that because the superior court has determined that Lisa has not been abandoned by her parents it necessarily determined that appellant was a parent.[10]
The record in the instant case includes the filings in the abandonment action. Although not a part of the record on this appeal (see People v. St. Martin (1969) 1 Cal.3d 524, 537-538 [83 Cal. Rptr. 166, 463 P.2d 390]), we nevertheless take judicial notice of the documents filed in that action. *646 (Evid. Code, § 452, subd. (d).) The effect of a prior adjudication between the same parties operates as a conclusive adjudication as to any issue "which appears upon its face to have been so adjudged, or which was actually and necessarily included therein or necessary thereto." (Code Civ. Proc., § 1911.) Those findings which might have been made but were not necessary to the judgment are not conclusive. (Guardianship of Leach (1947) 30 Cal.2d 297, 310-311 [182 P.2d 529].)
The petition to have Lisa declared free from the custody and control of her parents alleges that she is the natural child of her mother and appellant; that she is a person within the provisions of Civil Code section 232, subdivision (a); that neither natural parent has had control of Lisa for over two years; and that neither natural parent has made any provisions for her support.[11] The record does not disclose what evidence was received, what findings, other than the ultimate finding, were made or what rationale was adopted by the court. The record discloses only that "the evidence fails to show that [Lisa] is a person defined within the provisions of Section 232 of the Civil Code...."
It is apparent that on the record available the court might have found that Lisa had not been abandoned by both of the persons alleged to be her natural parents. (See In re Edwards (1930) 208 Cal. 725 [284 P. 916].) It would have been necessary for the court to have found that both of such persons had left Lisa in the care and custody of another within the meaning of Civil Code section 232, subdivision (a), as it then provided. A child taken from a parent by judicial order was not then deemed to have been left in the care and custody of another within the meaning of the statutory provision relied upon. (In re Conrich (1963) 221 Cal. App.2d 662 [34 Cal. Rptr. 658]; In re Barton (1959) 168 Cal. App.2d 584 [336 P.2d 210].) It also would have been necessary for the court to have found that both of Lisa's parents intended to abandon her, but to the contrary both parents had manifested an intention to maintain or reestablish their relationship with her. In any event it is clear that the court could have *647 concluded that Lisa had not been abandoned as alleged, without having found that the persons alleged to have abandoned her were in fact her parents. Under such circumstances the finding that Lisa was not a "person defined within the provisions" of Civil Code section 232 was warranted, and the court could have concluded its inquiry without making a finding as to parentage. Findings which might have been made but which were not necessary to the judgment are not conclusive on the parties within the meaning of Code of Civil Procedure section 1911. (Guardianship of Leach, supra, 30 Cal.2d 297, 310-311.) Lisa and the county are thus not collaterally estopped to deny that appellant is Lisa's natural father.

III
(5) We now confront the critical issue  can appellant offer proof in an appropriate judicial proceeding that he is Lisa's natural father notwithstanding a statutory presumption which, on its face, precludes him from doing so? Evidence Code section 661 provides that the child of a married woman is presumed to be the legitimate issue of that marriage and that the presumption can be disputed only by the woman, her husband, the descendants of one or both of them or the State of California in circumstances not here relevant.[12] Accordingly, as to appellant the presumption purports to be conclusive. (See Kusior v. Silver (1960) 54 Cal.2d 603, 618-619 [7 Cal. Rptr. 129, 354 P.2d 657].) He contends that contrary to due process requirements he is thus denied the opportunity to be heard in protection of a basic right.
Issues similar to those now urged by appellant were considered by the United States Supreme Court in Stanley v. Illinois, supra, 405 U.S. 645. The court on equal protection and due process grounds declared unconstitutional an Illinois statute which, upon the death of an unwed mother, made her children wards of the state without the father's right to be heard. In Stanley the father had physical custody of the children at the time of the mother's death, but the court purported to go beyond the precise facts of that case and held that the state was required to afford a hearing to all unwed fathers who desire and claim that they are fit to care for their children when the mother cannot or will not provide that care. *648 (Id., at p. 657, fn. 9 [31 L.Ed.2d at p. 562]; see also State v. Lutheran Soc. Serv. of Wis. & Upper Mich. (1970) 47 Wis.2d 420 [178 N.W.2d 56], vacated sub nom. Rothstein v. Lutheran Social Services (1972) 405 U.S. 1051 [31 L.Ed.2d 786, 92 S.Ct. 1488]; Rich, Plight of the Putative Father in California Child Custody Proceedings: A Problem of Equal Protection (1973) 6 U.C. Davis L.Rev. 1, 2-3.) The court premised its holding on "rights to conceive and to raise one's children,"[13] and held that such rights could not be taken from a father of a child born to a woman to whom he was not wed by operation of a statutory presumption of the father's unfitness.
In broad terms Stanley states that the interest of an unwed father in his children is not only cognizable but also of sufficient substance to warrant deference except when the deprivation comports with equal protection and due process requirements. "[T]he guarantee of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the objects sought to be attained." (Nebbia v. New York (1934) 291 U.S. 502, 525 [78 L.Ed. 940, 950, 54 S.Ct. 505, 89 A.L.R. 1469].) The question whether appellant, as one claiming to be Lisa's natural father, can rebut the presumption that Lisa is the issue of her mother's marriage must thus be resolved by weighing the competing private and state interests.[14]
*649 The private interests which appellant seeks to preserve in the instant case as in Stanley arose from more than the mere biological fact that he is Lisa's natural father.[15] Lisa was not conceived as the result of a casual relationship. Appellant resided with Lisa's mother both before and after Lisa's birth and contributed to her support. The mother used appellant's name during this period, and he appears as Lisa's father on her birth certificate. Appellant lived with Lisa and her mother as a family for four or five months and was deprived of Lisa's custody only because Lisa's mother, over appellant's wishes, elected to take Lisa with her when she returned to her husband. Appellant's then wife was aware of his living arrangements with Lisa's mother and gave her permission and encouragement for appellant's acknowledgment of Lisa as his child. (See Civ. Code, § 230.) Appellant first discovered that Lisa had been adjudged a dependent ward of the court when she was three years of age and visited with her when he was able to do so. He thereafter has consistently sought to assert his rights as her father.
It further appears that appellant has no alternate remedy by which he can protect his interest as Lisa's natural father. As in Stanley, appellant has no favored standing to petition for either the adoption or guardianship of the minor because under the applicable section of the Evidence Code he is not treated as a parent but as a stranger to the child. (See Stanley v. Illinois, supra, 405 U.S. 645, 647-649 [31 L.Ed.2d 551, 556-558].)
The countervailing interests of the state are not insignificant.[16] The state has a legitimate interest in Lisa's welfare and it is apparent on this record that the traumas already visited on the child may make it difficult *650 for her to cope with new relationships. But the balance to be struck is not obtained by measuring the minor's welfare against appellant's interests. We measure instead the state's narrower interest in precluding appellant from offering evidence of parentage against his interest in establishing that fact, and the question of the child's welfare lies beyond the question of her parentage. (See fn. 14, supra.)
The state's interest in maintaining the presumption of section 661 as a means of accomplishing the purposes of the Juvenile Court Law (§ 502; fn. 16, supra) is a consequence which cannot be controlling; in fact, the presumption may well defeat that purpose if the natural father, after establishing his paternity, is able to render proper parental care and control. (See Stanley v. Illinois, supra, 405 U.S. 645, 652-653, 654-655 [31 L.Ed.2d 551, 559-561].)
Nor does the state's interest in relieving a child of the stigma of illegitimacy (see Estate of Lund, supra, 26 Cal.2d 472) warrant the conclusiveness of the presumption. In fact, a natural father seeking to establish his paternity would undoubtedly intend to legitimatize the child as his own. (See fn. 14, supra.)
Although a state has a legitimate interest in promoting marriage, and in furtherance of that policy of not impugning a family unit (see Kusior v. Silver, supra, 54 Cal.2d 603, 619), that policy cannot be served when the family unit has been dissolved as here by the death not only of the mother but of the presumed father.
A possible legitimate interest which the state might assert in support of the conclusiveness of the presumption is speed and efficiency of judicial inquiry in circumstances where such inquiry might seldom be productive. In Stanley it was stated that it may be argued that unwed fathers are seldom fit parents. It was nevertheless concluded that due process precluded the conclusiveness of the presumption of unfitness. "The establishment of prompt efficacious procedures to achieve legitimate state ends is a proper state interest worthy of cognizance.... But the Constitution recognizes higher values than speed and efficiency. Indeed, *651 one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from overbearing concern for efficiency and efficacy...." (Stanley v. Illinois, supra, 405 U.S. 645, 656 [31 L.Ed.2d 551, 561-562].) The state "insists on presuming rather than proving Stanley's unfitness solely because it is more convenient to presume than prove. Under the Due Process Clause that advantage is insufficient to justify refusing a father a hearing when the issue at stake is the dismemberment of his family." (Id., at p. 658 [31 L.Ed.2d at p. 562].) "Procedure by presumption is always cheaper and easier than individualized determination." (Id., at pp. 656-657 [31 L.Ed.2d at p. 562].)
The court in Stanley thus conceded as arguable the proposition that an unwed father was unfit but rejected for due process reasons the conclusiveness of a presumption to that effect. We do not in the instant case concede as reasonably arguable a proposition that a claim of fatherhood is more generally without than with merit as, certainly, that claim would rarely, if ever, be made by a stranger. We hold, for reasons at least as compelling as those in Stanley, that a presumption which precludes to appellant in the instant circumstances a right to offer evidence to prove that he is the father of the minor child is unreasonable, arbitrary and capricious, and a denial of due process. (See Nebbia v. New York, supra, 291 U.S. 502, 525 [78 L.Ed. 940, 949-950].)[17]
The order is reversed insofar as it holds that the juvenile court lacks jurisdiction to determine parentage and that appellant has no standing to offer proof that he is the minor's father.[18] The judgment is affirmed in all other respects. Appellant is to recover his costs on appeal.
McComb, J., Tobriner, J., Mosk, J., Sullivan, J., Clark, J., and Burke, J.,[*] concurred.
NOTES
[1] Appellant appeared at a noticed hearing for the fourth annual review of Lisa's dependency status. (Welf. & Inst. Code, §§ 600, 729.) The public defender, who appeared as the minor's attorney, objected to the presence of appellant in the absence of proof that the latter was the legal father of the minor. In response to the court's inquiry, the attorney for appellant made an offer of proof of the latter's paternity. The particular order appealed from recites: "Court ordered it did not have jurisdiction to decide paternity. Court rules that Victor ... had no standing in this matter and ordered him to leave courtroom immediately." The order is appealable as an order made after a judgment assuming jurisdiction and declaring Lisa to be a person described in Welfare and Institutions Code section 600, subdivision (a). (See Welf. & Inst. Code, § 800.) The court further ordered that Lisa be continued in the status of a dependent child of the juvenile court pursuant to Welfare and Institutions Code section 600, subdivision (a). No appeal is taken from such further order.

Unless otherwise hereinafter specified all statutory references are to sections of the Welfare and Institutions Code.
[2] Section 600 provides in pertinent part: "Any person under the age of 18 years who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge such person to be a dependent child of the court. (a) Who is in need of proper and effective parental care or control and has no parent or guardian, or has no parent or guardian willing to exercise or capable of exercising such care or control, or has no parent or guardian actually exercising such care or control."
[3] It appears that before the death of the husband of Lisa's mother he had signed relinquishment documents for Lisa's adoption as her "legal father." It further appears, however, he appended to the document a statement to the effect that his relinquishment was not to be construed as an admission that he was the father of the minor. It also appears that Lisa's mother was encouraged by a man with whom she was then living not to relinquish Lisa for adoption.

In a supplementary report the probation officer commends the foster parents for the excellent work with Lisa who, when she came to them, had been abused and neglected and did not trust adults. It is reported that Lisa had since become "an attractive, alert and outgoing five year old." The "remarkable" change in the child is attributed to the "warmth and sense of security she has enjoyed" in the home of the foster parents.
[4] Included in the materials which appellant proposed to present to the court was a record of proceedings brought in the superior court pursuant to a petition under Civil Code section 232 by the county to establish that Lisa had been legally abandoned by her parents, presumably as a prelude to the adoption of Lisa by her foster parents without the need of consent by the abandoning parents. The cause was defended by appellant and the court held on April 2, 1973, that Lisa did not come within the provisions of section 232 and the petition was denied. That determination is now final, and appellant has since that date taken vigorous action to assert his rights as Lisa's father.

A further offer of proof was made to prove that appellant was previously married and had four children; that when separated from his wife he met Lisa's mother when they were students together at an adult school; that they lived together and she became pregnant by him in the fall of 1965; that Lisa was born on August 1, 1966, as a result of this pregnancy; that his surname was used on Lisa's birth certificate which lists him as the father and he acknowledged Lisa as his child; that he lived with Lisa and her mother after the birth of the minor and until she was four or five months old; that Lisa's mother then returned to her husband and, contrary to appellant's express wishes, would not surrender Lisa to him; that the whereabouts of Lisa became unknown to him but finally, in 1970, he located her through county welfare agencies and visited Lisa several times; that he became ill and his wife continued to visit Lisa until advised by welfare workers that both of them must discontinue such visits; that he refused to sign documents relinquishing his custody of Lisa when the same were presented to him by county agents; that after the hearing pursuant to Civil Code section 232 he arranged with the social worker to visit with Lisa. Proof was further offered that he had maintained his current employment for a year and a half; that he was in good health; that he was not taking medication; that he had not been required to see a psychiatrist for two years; that he enjoys a good relationship with his four sons and fulfills his role as a father including arrangements to support them again; that his immediate plans are to establish a relationship with Lisa and thereafter to establish a home for her.
[5] Section 701 provides in part that at the hearing to determine dependency status "any matter or information relevant and material to the circumstances or acts which are alleged to bring [the minor] within the jurisdiction of the juvenile court is admissible and may be received in evidence...."
[6] A petition for wardship may allege the names of "parents" as known to the petitioning probation officer. (§ 656, subd. (e).) Notice of the hearing must be sent to all persons so described. (§ 658; see also §§ 661, 662.) All such persons are entitled to be notified and to be present at the annual review of dependency. (§ 729.)
[7] Section 600, subdivision (a) (see fn. 2, supra), also provides that wardship may be predicated on an alternative finding that the minor for whom no guardian has been appointed has no parent willing to exercise or capable of exercising parental care or control, or has no parent actually exercising such care or control. It may be argued that these alternative grounds do not actually require a finding that there is a parent as such grounds may be found to exist if no one is exercising or is willing to exercise effective care and control.
[8] Section 602 provides that any minor "who violates any law ... is within the jurisdiction of the juvenile court, which may adjudge such person to be a ward of the court." Section 701, which states that "proof beyond a reasonable doubt supported by evidence, legally admissible in the trial of criminal cases, must be adduced to support a finding that the minor is a person described by section 602," may be deemed to inferentially provide for findings of criminal conduct. If so, similar provisions in section 701 relating to the burden of proof of issues civil in nature within sections 600 to 601, may be equally deemed to inferentially provide findings necessary to complete determinations under those sections.
[9] Although the purpose for which appellant wished to establish parentage is clouded, it sufficiently appears that his paternity was in issue for the purpose of seeking a modification of Lisa's dependency status. Section 778 affords such a right to a parent. In any event, it appears that even aside from the right to a formal determination of his paternity the court erred in ordering him to "leave the courtroom immediately." Appellant was alleged to be Lisa's father in the instant case. As such he was entitled to notice of the hearing. (§ 658.) As a person entitled to notice, he was further entitled to be present at the hearing on the question of wardship. (§ 679.) He was also entitled to notice of and to be present at the subsequent hearings on annual review as in the instant case. (§ 729.) His right to be present did not depend on his standing to prove paternity.
[10] The pertinent provisions of Civil Code section 232 are as follows: "(a) An action may be brought for the purpose of having [a minor] declared free from the custody and control of either or both of his parents when such person comes within any of the following descriptions: (1) Who has been left ... by both of his parents or his sole parent in the care and custody of another for a period of six months ... with the intent on the part of such parent or parents to abandon such person. Such failure to provide identification, failure to provide, or failure to communicate shall be presumptive evidence of the intent to abandon."
[11] At the time of proceedings in 1973, Civil Code section 232, subdivision (a), provided that a minor may be declared free from the custody and control of either or both parent if the minor has been left in the care and custody of others without provision for support, or without communication, for a period of six months with intent on the part of the parent or parents to abandon the minor. (Stats. 1972, ch. 579, pp. 993-994, § 10.)

A first amended petition was filed but not served prior to the hearing. It alleges that Lisa should be declared free from the custody and control of her parents for the reason that she had been neglected by her parents who had been deprived of her custody for a period of one year while the minor was a dependent of the juvenile court. Such allegations purport to satisfy the requirements of Civil Code section 232, subdivision (b), as provided by that subdivision at the time the petition was filed.
[12] Evidence Code section 661 provides: "A child of a woman who is or has been married, born during the marriage or within 300 days after the dissolution thereof, is presumed to be a legitimate child of that marriage. This presumption may be disputed only by the people of the State of California in a criminal action brought under Section 270 of the Penal Code or by the husband or wife, or the descendant of one or both of them. In a civil action, this presumption may be rebutted only by clear and convincing proof."
[13] "The rights to conceive and to raise one's children have been deemed `essential,' Meyer v. Nebraska, 262 U.S. 390, 399 (1923), `basic civil rights of man,' Skinner v. Oklahoma, 316 U.S. 535, 541 (1942), and `[r]ights far more precious ... than property rights,' May v. Anderson, 345 U.S. 528, 533 (1953). `It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' Prince v. Massachusetts, 321 U.S. 158, 166 (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, Meyer v. Nebraska, supra, at 399, the Equal Protection Clause of the Fourteenth Amendment, Skinner v. Oklahoma, supra, at 541, and the Ninth Amendment, Griswold v. Connecticut, 381 U.S. 479, 496 (1965) (Goldberg, J., concurring).

"Nor has the law refused to recognize those family relationships unlegitimized by a marriage ceremony. The Court has declared unconstitutional a state statute denying natural, but illegitimate, children a wrongful-death action for the death of their mother, emphasizing that such children cannot be denied the right of other children because familial bonds in such cases were often as warm, enduring, and important as those arising within a more formally organized family unit. Levy v. Louisiana, 391 U.S. 68, 71-72 (1968)." (Stanley v. Illinois, supra, 405 U.S. 645, 651-652 [31 L.Ed.2d 551, 558-559].
[14] Such a weighing process in Stanley was struck in favor of the unwed father's right to submit evidence in rebuttal of a presumption that he was unfit to care for his illegitimate children. In the instant case the question of appellant's fitness to care for Lisa has not yet been placed in issue. The narrow question before us is whether he can submit evidence tending to establish parentage. If we assume that he can establish that he is Lisa's father in a proper proceeding in the juvenile court that court retains jurisdiction to continue or discontinue Lisa's dependency status in further proceedings pursuant to the Juvenile Court Law, and appellant's fitness may then be placed in issue.

We also note that in Stanley the question of legitimacy was in issue, as the presumption as to a father was applicable only in the event of the children's illegitimacy. (Stanley v. Illinois, supra, 405 U.S. 645, 650 [31 L.Ed.2d 551, 558].) Lisa, having been born while her mother was married, is a legitimate child of that marriage if appellant is unsuccessful in rebutting the presumption (Evid. Code, § 661) or, if appellant successfully rebuts the presumption and pursues his stated intentions, she may become the legitimate child of appellant (Civ. Code, § 230; see Estate of Lund (1945) 26 Cal.2d 472 [159 P.2d 643, 162 A.L.R. 606]; Estate of Gird (1910) 157 Cal. 534, 543 [108 P. 499]). It appears according to appellant's offer of proof, moreover, that he has already legitimatized Lisa pursuant to Civil Code section 230. (See infra.)
[15] For purposes of weighing the competing interests, we accept as true the matters asserted in appellant's offer of proof, which offer the juvenile court held to be insufficient.
[16] The purpose of the Juvenile Court Law is stated in section 502: "... to secure for each minor under the jurisdiction of the juvenile court such care and guidance, preferably in his own home, as will serve the spiritual, emotional, mental, and physical welfare of the minor and the best interests of the State; to preserve and strengthen the minor's family ties whenever possible, removing him from the custody of his parents only when his welfare or safety and protection of the public cannot be adequately safeguarded without removal; and, when the minor is removed from his own family, to secure for him custody, care, and discipline as nearly as possible equivalent to that which should have been given by his parents. This chapter shall be liberally construed to carry out these purposes."
[17] As our discussions have indicated, the reasonableness of a statutory limitation on the right to offer proof of parentage depends on circumstances prevailing in each particular case. Accordingly, a court, before receiving evidence thereof, must in each instance make a preliminary determination, as by offer of proof, that due process concepts would be offended if the particular claimant to parentage were denied an opportunity to prove his claim.
[18] The order appealed from provides for other routine matters relative to Lisa's dependency status which were not placed in issue.
[*] Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.